UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| MCIVAN JONES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:12CV00064 AGF |
| | ) |
| CORNERSTONE NATIONAL | ) |
| INSURANCE COMPANY, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This matter is before the Court on Defendant Cornerstone Insurance Company's motion for summary judgment. Defendant, a Write-Your-Own ("WYO") Program carrier, participating in the United States Government's National Flood Insurance Program ("NFIP") which is administered by Federal Emergency Management Agency ("FEMA") pursuant to the National Flood Insurance Act,[1] appears in its fiduciary capacity as the fiscal agent of the United States.[2] For the reasons set forth below, Defendant's motions will be denied in part, and granted in part.

## BACKGROUND

Plaintiff McIvan Jones is the owner of property located approximately 20 miles from the Birds Point-New Madrid Floodway on the Mississippi River in Mississippi County, Missouri. In 2011, mid-Spring storms produced high water levels in the

---

[1] 42 U.S.C. § 4011(a).

[2] 42 U.S.C. § 4071(a)(1).

1

Mississippi River, causing flooding in numerous states and counties, including Mississippi County. On April 23, 2011, to assist in his wheat harvesting efforts, Plaintiff applied for a loan in the amount of $51,523 but was informed that he would first need to acquire flood insurance. (Pl.'s Dep., Doc. No. 30-8.)

Two days later, on April 25, 2011, the United States Army Corps of Engineers ("Corps") issued a news release which stated it would be initiating a "readiness plan" to operate the Birds Point Floodway by detonating one of its levees, noting that "[n]o decision can be made at this time whether or not to artificially open the floodway." (Doc. No. 30-5.) Defendant maintains that on the same day the local sheriff "ordered" Plaintiff to evacuate his property due to the "impending flood," while Plaintiff maintains that the sheriff "asked" him to evacuate due to the "anticipated decision . . . to artificially breach" the Birds Point levee. (Doc. Nos. 30, 34.)

In a declaration dated April 27, 2011, the individual responsible for determining whether and when the Floodway would be operated stated that the National Weather Service projected the water level of the Mississippi River at Cairo, Illinois (located across from Mississippi County, on the Illinois side of the river), would peak at 60.5 feet by May 1, 2011, and that thus a decision on whether or not to detonate the levee had to be made as early as April 29, 2011. He further stated that he would make this decision "if and when it is absolutely essential to do so." The declaration stated that if the floodway were operated, approximately 550,000 cubic feet per second of water would be diverted into the floodway "during a project design flood of 2,360,000 cfs." The areas listed that

would be protected by an artificial breach of the levee included Cairo, Illinois, but did not include Mississippi County, Missouri. (Doc. No. 30-11.)[3]

**The Insurance Policies**

Also on April 27, 2011, Plaintiff completed flood insurance applications for several of his buildings. Plaintiff claims that when he handed a check to the insurance agent that day for the premiums, the agent stated the property would be covered as of that day. Plaintiff's discussions during this meeting with the insurance agent also included Plaintiff's concerns regarding the river's high level and the possibility that the levee may be artificially breached. (Pl.'s Dep., Doc. No. 30-8.) On April 28, 2011, Defendant issued several Standard Flood Insurance Policies ("SFIPs") to Plaintiff, each on a separate building on his property. Pursuant to their joint stipulation of facts, the parties now agree that the policies were effective May 2, 2011, through May 2, 2012. (Doc. No. 41 at 10.) The coverage of these policies was in the aggregate of approximately $388,000. (Doc. No. 30-9.)

The policies stated that Defendant would pay for "direct physical loss by or from flood to [the] insured property" as long as the premiums were paid, there was compliance with all terms and conditions, and accurate information and statements were furnished. (Doc. No. 34-1.)

---

[3] This declaration was made in connection with *Missouri v. United States Army Corps of Engineers*, No. 1:11CV00067, 2011 WL 1630339 (E.D. Mo. Apr. 29, 2011). In that case, the State of Missouri and the Missouri Department of Natural Resources unsuccessfully sought to enjoin the Corps from activating the Birds Point Floodway.

Article V(B) of each of these policies, commonly referred to as the "flood in progress" provision, stated: "We do not insure a loss directly or indirectly caused by a flood that is already in progress at the date and time: (1) The policy term begins. . . ." Article II(A)(1) defined the term "flood" as:

> A general and temporary condition of partial or complete inundation of two or more acres of normally dry land area or of two or more properties (at least one of which is your property) from (a) overflow of inland or tidal waters; (b) unusual and rapid accumulation or run off of surface waters from any source; (c) mud flow.

Regarding all definitions, the policies stated: "Some definitions are complex because they are provided as they appear in the law or regulations or result from court cases. The precise definitions are intended to protect you."

On May 2, 2011, Plaintiff closed on the loan he had applied for on April 23, 2011. (Doc. No. 30-14.)

**<u>Breach of the Levee, FEMA's Memoranda, and Denial of Claims</u>**

On May 2, 2011, at 10:00 p.m., the Corps artificially breached the Birds Point levee. Plaintiff's property was flooded two days later on May 4, 2011. Plaintiff subsequently submitted a claim to Defendant for damages his property sustained. On May 17, 2011, the Acting Federal Insurance and Mitigation Administrator of FEMA sent a Memorandum to WYO Principal Coordinators and the NFIP Servicing Agent to provide guidance in determining when the "flood in progress" exclusion is triggered. The Memorandum stated that FEMA considers the "flood in progress" exclusion to be triggered by the earlier of the following situations:

4

    A. The community where the insured building is located first experiences a flood as defined in the SFIP, or

    B. The date and time of an event initiating a flood that causes damage, including but not limited to:

        i. a spillway is opened,
       ii. a levee is breached,
      iii. water is released from a dam, or
      iv. water escapes from the banks of a waterway (stream, river, creek, etc.)

The Memorandum further stated that FEMA "**does not** interpret the Section V(B) exclusion as being triggered only when floodwaters physically touch the insured building." (Doc. No. 30-1.) FEMA issued another Memorandum on June 11, 2011, which explained why flood insurance policies could still be issued even when a flood is already in progress:

> Even with a flood in progress, an intervening event that had not started at the time the policy became effective could cause a separate and independent flood event for which coverage could be afforded. . . . [O]ne reason that FEMA did not impose a moratorium on sales, even when there is a flood in progress, is because of the possibility that a loss will be caused by a flood that was not in progress when the policy became effective.

(Doc. No. 30-3.)

On June 20, 2011, FEMA issued a Memorandum that listed "the earliest dates a county first experienced flooding" from the 2011 mid-Spring storms. This Memorandum stated that Mississippi County first experienced flooding on April 22, 2011. (Doc. No. 30-2.) On June 30, 2011, FEMA issued a Memorandum that provided guidance for vendors when advising customers whether to purchase flood insurance in light of possible

5

"flood in progress" determinations. FEMA illustrated that a claim could be covered in a situation where an SFIP was effective prior to opening the gates of a spillway:

> [W]hen the Morganza spillway opened in Louisiana and released water on to the ground so that two acres of normally dry land were generally and temporarily inundated, there was a flood and a flood in progress. As long as the spillway gates were opened and continued to feed that flood, it was part of a single, continuous flood event. Any property insured under an SFIP that was damaged by those floodwaters, wherever those floodwaters went and whenever those floodwaters reached the property, the start of the flood in progress would still be date that a flood, as defined by the SFIP, first occurred after the opening of the . . . spillway.

The June 20, 2011 Memorandum went on to state that "[i]f the subsequent flood event causing a loss started after the SFIP became effective, the claim from the subsequent flood event should be covered, even if an inevitable and excluded flood in progress would have (or does) damage the property at a later date." (Doc. No. 30-3.)

On July 21 and 26, 2011, Defendant denied Plaintiff's flood loss claims (of approximately $334,000) pursuant to the "flood in progress" provision in Plaintiff's policies and FEMA's June 11, 2011 Memorandum, on the basis that there was a flood in progress prior to the inception date of Plaintiff's SFIP. (Doc. No. 30-13.)

On March 20, 2012, Plaintiff filed an action against Defendant in state court, asserting claims of breach of contract for which Plaintiff sought damages in the amount of $388,000 (the policies' aggregate limit) for Defendant's failure to make any payment under the SFIPs (Count I); and negligent misrepresentation for which Plaintiff sought damages in the amount of $25,000 on the basis that he relied on Defendant's agent's representation that Plaintiff's property would be covered for flood damage that occurred

6

after April 28, 2011 (Count III).[4] On April 23, 2013, Defendant removed the case to this Court on the basis of federal question jurisdiction.

## ARGUMENTS OF THE PARTIES

**Defendant's Arguments**

Defendant argues that it is entitled to summary judgment because Plaintiff's SFIPs expressly stated the policies would not cover losses resulting from a flood in progress. Defendant relies on FEMA's interpretation of the SFIPs' terms, which Defendant argues is required by 44 C.F.R. Pt. 62 App. A., Art. II(G)(1). This regulation states, "[Companies participating in the NFIP] shall comply with written standards, procedures, and guidance issued by FEMA . . . relating to the NFIP and applicable to the Company."

Specifically, Defendant relies on the following to establish that Plaintiff's damage resulted from a flood in progress: (1) FEMA determined that Mississippi County first experienced flooding on April 22, 2011; (2) FEMA interpreted the "flood in progress" provision in SFIPs to mean the date a community first experiences flooding; (3) Plaintiff was issued SFIPs that were effective May 2, 2011; and (4) Plaintiff's flood damage occurred on May 4, 2004. Thus, Defendant argues there is no issue of material fact that Plaintiff's flood damage resulted from a flood that was already in progress, and therefore, his claims were properly denied.

Second, Defendant argues that it is entitled to summary judgment based on the common law doctrine of loss in progress. Defendant asserts that Plaintiff's claims were

---

[4] Plaintiff also asserted a cause of action for vexatious refusal to pay (Count II), but later conceded that this cause of action was pre-empted by federal law. (Doc. No. 35 at 9.)

properly denied because Plaintiff knew or should have known that the loss was in progress when he applied for the SFIPs on April 27, 2011. Defendant relies on the fact that Plaintiff discussed the river's high level and the possibility of the levee being artificially breached during the meeting with the insurance agent on that day. Defendant points out that federal common law, which controls the interpretation of the SFIPs, draws upon standard insurance law principles such as the loss-in-progress doctrine to resolve coverage disputes.

Defendant argues that Plaintiff's claim of negligent misrepresentation cannot succeed because Plaintiff is responsible for knowing the terms of the federal program in which he participates and because the agent's representations cannot bind Defendant because the agent is the agent of insured pursuant to 44 C.F.R. § 61.5(e).

**Plaintiff's Arguments**

Plaintiff argues that there is a general dispute of material fact with respect to which flood damaged his property. Specifically, Plaintiff claims that while Defendant denied his claims on the basis that a flood was in progress as of April 22, 2011, the flood that damaged his property was a second, separate flood which originated from the artificial breach of the Birds Point levee on May 2, 2011. Plaintiff points to the fact that even after the levee was breached, it took at least 24 hours for floodwater to reach his property, which was approximately 20 miles away, and he argues that there is a genuine dispute of fact as to whether the flood that was in progress on April 22, 2011, would have eventually reached his property.

Plaintiff also argues that the SFIPs' definition of "flood" controls over any FEMA Memoranda with respect to the interpretation of that term. Plaintiff argues that because the SFIPs define the term "flood" as an inundation of water on two or more acres of normally dry land, at least one of which is the property of the insured, there was not a flood in progress until May 4, 2011, the date there was an inundation of water on Plaintiff's property.

Plaintiff does not address Defendant's arguments with respect to the common law doctrine of loss in progress or the negligent misrepresentation cause of action.

## DISCUSSION

### Summary Judgment Standard

Summary Judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the facts must be viewed in a light most favorable to the non-moving party, and the non-moving party must be given the benefit of all reasonable inferences that can be drawn from the facts. *Auto Club Ins. Ass'n v. Sentry Ins.,* 683 F.3d 889, 891 (8th Cir. 2012).

### Liability under the SFIPs

Insurance policies under the NFIP are subject to regulations issued under the NFIP as well as the specific terms and conditions of the SFIP. 44 C.F.R. § 61.4. Because of the NFIP's national scope, courts aim to "fashion uniform interpretation throughout the country" in order to prevent state to state coverage variances. *Suopys v. Omaha Prop. & Cas.,* 404 F.3d 805, 809 (3d Cir. 2005). As the parties agree, federal law governs the

9

interpretation of Plaintiff's SFIPs and federal courts draw upon standard insurance law principles to resolve SFIP coverage disputes. *Studio Frames Ltd. v. Standard Fire Ins. Co.*, 483 F.3d 239, 244-45 (4th Cir. 2007). If the disputed policy language is clear and unambiguous, it should be accorded its natural meaning. *Id.* at 245. If the disputed policy language is susceptible to different meanings, the court's construction of the language must favor the insured. *Id.* With respect to when summary judgment is appropriate, the Second Circuit has summarized the rule as the following:

> Where contractual language is ambiguous and subject to varying reasonable interpretations, intent becomes an issue of fact and summary judgment is inappropriate. The mere assertion of an ambiguity does not suffice to make an issue of fact . . . . Only where the language is unambiguous may the district court construe it as a matter of law and grant summary judgment accordingly.

*Palmieri v. Allstate Ins. Co.*, 445 F.3d 179, 188 (2d Cir. 2006).

Courts defer to a federal agency's interpretation of its own regulations "unless that interpretation is plainly erroneous or inconsistent with the regulation." *Decker v. Nw. Envtl. Def. Ctr.,* 133 S. Ct. 1326, 1337 (2013) (citation omitted). The agency's interpretation "need not be the only possible reading of a regulation—or even the best one—to prevail." *Id.* The Supreme Court has further established that "the appearance of rules and regulations in the Federal Register gives legal notice of their contents." *Fed. Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 385 (1947).

The Memorandum issued on May 17, 2011, reflects FEMA's interpretation of the SFIP "flood in progress" provision to mean the earlier of when (1) the community of the insured building first experiences a flood as defined by the SFIP; or (2) the date and time

10

of an event initiating a flood that causes damage. The Memorandum issued on June 20, 2011, declared that Mississippi County first experienced flooding on April 22, 2011. Defendant argues that pursuant to these two Memoranda, Plaintiff's claims were properly denied because the "flood in progress" provision in the SFIPs were triggered on April 22, 2011, and Plaintiff's policies were not effective until May 2, 2011. Defendant relies on *Stinson v. United States,* 508 U.S. 36, 44-45 (1993) (holding that the federal Sentencing Commission's commentary to the Sentencing Guidelines for federal courts must be given controlling weight), to support its assertion that these Memoranda must be given controlling weight.

The Court concludes that even if FEMA's above Memoranda constitute interpretations of its own regulations and should thus be accorded controlling weight, that would not be dispositive in this case. Accepting FEMA's declaration as true that "the [Mississippi County] community first experienced flooding" on April 22, 2011, Plaintiff's property was not flooded until May 4, 2011, two days after the Corps artificially breached Birds Point levee. The Court finds a fact question is presented as to whether the artificial breach of this levee created a second, separate flood from the flooding that began on April 22, 2011.

The possibility of such a second flood was contemplated by FEMA, as reflected in FEMA's June 11, 2011 Memorandum, which states: "Even with a flood in progress, an intervening event that had not started at the time the policy became effective could cause a separate and independent flood event for which coverage could be afforded." Moreover, the June 11, 2011 Memorandum illustrated a factually similar scenario, where

11

a spillway was opened in Louisiana, and referred to the opening of that spillway as creating a new flood.

At least one other court has suggested that the artificial breach of the Birds Point levee created a new flood on May 2, 2011, separate from the general flooding in the community that began on April 22, 2011. *See Big Oak Farms, Inc. v. United States,* 105 Fed. Cl. 48, 57 (Fed. Cl. 2012) (referring to the breach of the Birds Point levee as resulting in "the May 2, 2011 flood"). Accordingly, the Court concludes that the "flood in progress" provisions in the policies are not a sufficient ground for summary judgment.

**<u>Common Law Loss-in-Progress Doctrine</u>**

The Court is also not persuaded by Defendant's argument that it is entitled to summary judgment pursuant to the common law doctrine of loss in progress. This doctrine precludes recovery when the insured is "aware of a threat of loss so immediate that it might fairly be said that the loss was in progress and that the insured knew it at the time the policy was issued or applied for." *Am. & Foreign Ins. Co., Inc. v. Sequatchie Concrete Servs., Inc.,* 441 F.3d 341, 343 (6th Cir. 2006) (citation omitted). The loss-in-progress doctrine is "a fundamental principle of insurance law [which provides] that an insurer cannot insure against a loss that is known or apparent to the insured." *Lloyd's Acceptance Corp. v. Affiliated FM Ins. Co.,* 4:05 CV 1934 DDN, 2013 WL 5101938, at *6 (E.D. Mo. Sept. 12, 2013) (quoting *United Capitol Ins. Co. v. Hoodco, Inc.*, 974 S.W.2d 572, 574 (Mo. Ct. App. 1998)).

Although Defendant cites numerous cases in which courts have applied the loss-in-progress doctrine in flooding scenarios, Defendant has failed to prove as a matter of

12

law that the facts of this case support summary judgment. The cases on which Defendant relies are all factually distinguishable from the case at bar. To illustrate, the Court will address two cases on which Defendant relies.

In *Drewett v. Aetna Casualty & Surety Co.,* 539 F.2d 496, 497 (5th Cir. 1976)*,* on and before the day the plaintiff applied for his SFIP, flood waters had already risen three to four feet up the stilts of his home. The plaintiff's property was ultimately damaged from a nearby levee naturally breaking, causing the flood waters to rise into the plaintiff's home. *Id*. Here there was no water in the immediate vicinity of Plaintiff's property when he applied for the SFIPs. Secondly, while the breach of a levee may have also been the proximate cause of damage in both *Drewett* and this case, here, the breach was artificial, which is a distinction the Court finds significant. When a levee naturally breaks, it does so due to the strength of the existing flood waters and thus, any flood created from that break can best be described as a continuation of the original flood. However, when a breach is artificial to divert floodwaters from reaching another area, any new flood resulting from that breach cannot necessarily be considered a continuation of the original flood because it is uncertain whether those new flood waters would have ever existed were it not for the intentional intervention. Therefore, whether the artificial breach here created a separate flood as opposed to a continuation of the general flooding that began on April 22, 2011, is a genuine fact dispute.

Furthermore, it is not clear whether when Plaintiff applied for his SFIPs, he was either aware that the general flooding that began on April 22, 2011, would result in an immediate loss or aware that the levee would be breached several days later which would

13

result in an immediate loss. Considering that Plaintiff's property was several miles from the general flooding when he applied for his SFIPs, the Court cannot find as a matter of law that he was aware of an immediate loss. With respect to Plaintiff's awareness of an immediate loss from the artificial breach of the levee, the facts only demonstrate that Plaintiff was aware of the "possibility" of such a breach when he applied for his SFIPs on April 27, 2011. Indeed on that same day, the individual responsible for making the decision of whether to breach the levee stated that he had not made the determination of whether to do so.

In *Summers v. Harris*, 573 F.2d 869 (5th Cir. 1978), a floodway was opened due to the high water level in the Mississippi River. The floodway was closed later the same day but then re-opened one or two days later, after which flood waters came within a "few feet" of the plaintiff's house. *Id.* at 871. The plaintiff then purchased a SFIP. The court found that the floodwater that entered the plaintiff's house after he purchased the policy "was a continuation of the flooding process that began [when the floodway was first opened]," and that the loss was in progress as of that date. *Id.* at 872. Here, there were no flood waters near Plaintiff's property when he applied for his SFIPs. Thus, the Court is not persuaded by Defendant's argument that, as a matter of law, there was an "immediate" threat of loss when Plaintiff applied for his SFIPs. Further, for reasons previously stated, on this record the Court cannot find as a matter of law that the flooding from the artificial breach was a "continuation" of the general flooding that began on April 22, 2011.

**Negligent Misrepresentation Claim**

The Court agrees with Defendant that Plaintiff cannot prevail on his negligent misrepresentation claim in this case. First, as noted above, the parties now agree that the effective date of Plaintiff's SFIPs was May 2, 2011. Secondly, 44 C.F.R. § 61.5(e) addresses this issue by stating:

> [R]epresentations regarding the extent and scope of coverage [under the SFIP] which are not consistent with the National Flood Insurance Act of 1968 . . . or the Program's regulations, are void, and the . . . [insurance] agent acts for the insured and does not act as agent for the Federal Government, the Federal Emergency Management Agency, or the [WYO carrier].

"By creating the legal fiction that an insurance agent 'acts for the insured,' instead of for her employer (the private insurance company), § 61.5(e) shields the private insurance company from liability for certain of the agent's tortious acts." *Remund v. State Farm Fire & Cas. Co.,* 483 F. App'x 403, 408 (10th Cir. 2012).

## **CONCLUSION**

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Cornerstone Insurance Company's motion for summary judgment is **DENIED** with respect to Count I and **GRANTED** with respect to Count III. (Doc. No. 29.)

_Audrey G. Fleissig_
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 2nd day of April, 2014.