UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| McIVAN JONES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:12CV00064 AGF |
| | ) | |
| CORNERSTONE NATIONAL | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This matter is before the Court following a bench trial held on June 11, 2014. Defendant Cornerstone National Insurance Company, a Write-Your-Own ("WYO") program carrier participating in the federal government's National Flood Insurance Program ("NFIP") pursuant to the National Flood Insurance Act of 1968, as amended, appears in its fiduciary capacity as the fiscal agent of the United States. Plaintiff McIvan Jones seeks recovery under several Standard Flood Insurance Policies ("SFIP") issued by Defendant under the NFIP. Defendant maintains that recovery is precluded by the "flood-in-progress" exclusion in the policies, and pursuant to the common law doctrine of loss-in-progress. The following findings of fact and conclusions of law are entered based on the entire record, including the trial testimony and exhibits, and the parties' post-trial briefs. As set forth below, judgment shall be entered on behalf of Plaintiff and against Defendant.

## FINDINGS OF FACT

Jones, through his company Jones Family Farm Registered, LLP, is the owner of farm property located on a ridge in East Prairie, Mississippi County, Missouri. Mississippi County, consisting of approximately 262,000 acres, is located in the southeastern part of Missouri, with its eastern, northern, and southern borders along the Mississippi River. East Prairie is approximately 15 miles west of the river and the Birds Point-New Madrid Floodway (the "Floodway") on the bank of the river. The purpose of the Floodway is to divert water from the Mississippi River during major flood events and lower flood risks upstream, notably at Cairo, Illinois, located across from the southern tip of Mississippi County, on the Illinois side of the river. The Floodway is operated by detonating one of its levees. Prior to 2011, this had been contemplated numerous times, but had not actually been done since 1937.

By April 22, 2011, mid-Spring storms produced historically high water levels in the Mississippi River, causing flooding in numerous states and counties, including Mississippi County. On April 22 or 23, 2011, to help finance his wheat planting for the season, Plaintiff applied for a loan in the amount of $51,523, to be secured by buildings on his property. He was informed that he would first need to acquire flood insurance. On April 25, 2011, the United States Army Corps of Engineers ("the Corps") issued a news release which stated that it would be initiating a "readiness plan" to operate the Floodway by detonating one of its levees, noting that "[n]o decision can be made at this time whether or not to artificially open the floodway." On the same day, the local sheriff told Plaintiff to evacuate his property due to impending flooding. Plaintiff began moving

household furnishings and farm equipment in case the Corps did breach the levee, and continued his moving efforts for four days.

On April 27, 2011, Plaintiff completed flood insurance applications with Defendant for several of his buildings. By that time, the National Weather Service projected the water level of the Mississippi River at Cairo would peak at 60.5 feet by May 1, 2011; thus a decision on whether or not to detonate the levee would probably have to be made by April 29, 2011.

When Plaintiff applied for the flood insurance and paid his premium on April 27, his land was dry. "Backwaters" from the river were one quarter to one half of a mile away from his property. Plaintiff's property had previously experienced backwater flooding on several occasions, but in the past, flooding had never done any damage to his property or buildings, other than leaving some debris behind. On April 28, 2011, Defendant issued several SFIPs to Plaintiff, each pertaining to a separate building on his property. Pursuant to the parties' joint stipulation of facts, the policies were effective May 2, 2011, through May 2, 2012. (Doc. No. 41 at 10.) The coverage of these policies was, in the aggregate, approximately $388,000. The policies stated that Defendant would pay for "direct physical loss by or from flood to [the] insured property" as long as the premiums were paid, Plaintiff complied with all terms and conditions, and accurate information and statements were furnished.

Article V(B) in each of the SFIPs, commonly referred to as the "flood in progress" provision, stated: "We do not insure a loss directly or indirectly caused by a flood that is already in progress at the date and time: (1) The policy term begins. . . ."

3

Article II (A)(1) defined the term "flood" as: "A general and temporary condition of partial or complete inundation of two or more acres of normally dry land area or of two or more properties (at least one of which is your property) from (a) overflow of inland or tidal waters; (b) unusual and rapid accumulation or run off of surface waters from any source; (c) mud flow." Regarding all definitions, the policies stated: "Some definitions are complex because they are provided as they appear in the law or regulations or result from court cases. The precise definitions are intended to protect you."

On April 29, 2011, a decision was issued in *Missouri ex rel. Koster v. United States Army Corps of Engineers*, No. 1:11CV00067 SNLJ, 2011 WL 1630339 (E.D. Mo. Apr. 29, 2011), denying the State of Missouri and the Missouri Department of Natural Resources' motion to enjoin the Corps from operating the Floodway. On May 2, 2011, Plaintiff closed on the loan he had applied for on April 23, 2011. Neither at the time Plaintiff applied for and paid for the insurance, nor at the time Plaintiff closed on the loan did Plaintiff know with any certainty whether the levee would be breached. Although Defendant emphasizes the notice from the Sheriff to vacate and that Plaintiff moved belongings, those actions would have been prudent, if not necessary, regardless of whether the levee was going to be blown.

Later that day, at 10:00 p.m., the Corps artificially breached a levee of the Floodway. Plaintiff's property was flooded two days later, on May 4, 2011. The levee breach resulted in massive flooding of Plaintiff's farm and damage to the buildings, a level of destruction very different from the debris being left behind that occurred with

previous flooding. Plaintiff subsequently submitted a claim to Defendant for damage his property sustained.

On May 17, 2011, FEMA sent a Memorandum (Bulletin W-11030) to WYO Principal Coordinators and the NFIP Servicing Agent. The Memorandum stated, "[t]his Bulletin provides guidance" regarding what triggers the "flood in progress" exclusion in SFIPs. The Memorandum stated that FEMA considers the "flood in progress" exclusion to be triggered by the earlier of the following situations:

> A. The community where the insured building is located first experiences a flood as defined in the SFIP, or
>
> B. The date and time of an event initiating a flood that causes damage, including but not limited to:
>
> > i) a spillway is opened,
> > ii) a levee is breached,
> > iii) water is released from a dam, or
> > iv) water escapes from the banks of a waterway (stream, river, creek, etc.)

(Doc. No. 30-1.) The Memorandum further stated that FEMA "**does not** interpret the Section V(B) exclusion as being triggered only when floodwaters physically touch the insured building." *Id.*

On June 20, 2011, FEMA issued a Memorandum (Bulletin W-11039) that listed "the earliest dates a county first experienced flooding" from the 2011 mid-Spring storms. This Memorandum stated that Mississippi County first experienced flooding on April 22, 2011. On June 30, 2011, FEMA issued a Memorandum (Bulletin W-11045) to provide guidance to WYO agents when advising customers whether to purchase flood insurance

5

at that time "in light of possible flood in progress determinations." This Memorandum stated, in part, as follows:

> FEMA recommends that when agents receive an application for the purchase of an SFIP, they discuss the flood-in-progress exclusion contained in Section V(B) of the SFIP and explain that a loss caused by a flood in progress may be excluded from coverage. Agents also should explain that the applicability of the exclusion can be determined only after a loss has occurred. Even with a flood in progress, an intervening event that had not started at the time the policy became effective could cause a separate and independent flood event for which coverage could be afforded. . . . Indeed one reason that FEMA did not impose a moratorium on sales, even when there is a flood in progress, is because of the possibility that a loss will be caused by a flood that was not in progress when the policy became effective.
>
> \* \* \*
>
> For example, when the Morganza spillway opened in Louisiana and released water on to the ground so that two acres of normally dry land were generally and temporarily inundated, there was a flood and a flood in progress. As long as the spillway gates were opened and continued to feed that flood, it was part of a single, continuous flood event. Any property insured under an SFIP that was damaged by those floodwaters, wherever those floodwaters went and whenever those floodwaters reached the property, the start of the flood in progress would still be the date that a flood, as defined by the SFIP, first occurred after the opening of the Morganza spillway.

(Doc. No. 30-3.) The June 20, 2011 Memorandum went on to state that "[i]f the subsequent flood event causing a loss started after the SFIP became effective, the claim from the subsequent flood event should be covered, even if an inevitable and excluded flood in progress would have (or does) damage the property at a later date." *Id*.

The independent Flood Adjuster responsible for investigating Plaintiff's claim issued his final report on July 17, 2011. (Joint Ex. J7.) The report included a list of losses that were reported to the NFIP for insured properties located in East Prairie from

6

April 22, 2011 through May 2, 2011, as follows: one on April 22, none on April 23 or April 24, one on April 25, one on April 26, none on April 27, seven (all claims from the same farmer) on April 28, none on April 29, one on April 30, none on May 1 or May 2 ("two full days of reporting before the blasting at 10:00 PM on 5/2/2011"), and fifty-two on May 3. The Adjuster concluded as follows:

> [T]he flood event that struck the insured risk on 5/04/11, was not a flood in progress as described by the SFIP and/or FEMA's WYO Bulletin [of June 20, 2011], rather was the result of [the Corps] blasting the Mississippi River levee system at Birds Point, MO on 05/02/2011 at [sic] touching the insured risk elevation/building on 05/04/2011.

*Id.* Nevertheless, on July 21 and again on July 26, 2011, Defendant denied Plaintiff's flood loss claims (totaling approximately $334,000) pursuant to the flood in progress provision in Plaintiff's policies and FEMA's June 20, 2011 Memorandum, on the basis that there was a flood in progress prior to the inception date of Plaintiff's SFIP.

Plaintiff appealed the denial of his claim to FEMA, and by letter dated October 31, 2011, FEMA advised Plaintiff that it concurred with Defendant's findings and upheld the denial of benefits. FEMA stated in the letter that its investigation confirmed that Plaintiff's SFIPs were "issued with an effective date of April 28, 2011," but that in accordance with FEMA's June 20, 2011 Memorandum, "there was a flood in progress for Mississippi County in the Mississippi River Basin beginning April 22, 2011." (Doc. No. 30-17.) FEMA rejected Plaintiff's argument attributing the flooding of his land to the blasting of the levee on May 21, 2011, reasoning that that blasting "was in connection with the same spring flooding by the Mississippi River and its tributaries." *Id.* The letter

7

noted that in addition, "NFIP records show other flood claims were filed for East Prairie properties prior to April 28, 2011." *Id.*

On March 20, 2012, Plaintiff filed this action in state court, asserting a claim of breach of contract for which Plaintiff sought damages in the amount of $388,000 (the policies' aggregate limit) for Defendant's failure to make any payments under the SFIPs.[1] On April 23, 2013, Defendant removed the case to this Court on the basis of federal question jurisdiction. 28 U.S.C. §1331.

## **CONCLUSIONS OF LAW**

The NFIP is administered by FEMA and the Federal Insurance Administration ("FIA"). Congress delegated rulemaking authority exclusively to the federal government to determine the terms and conditions of insurability and to write the flood policy. 42 U.S.C. §§ 4013(a) & 4019. FEMA exercised its authority under §4013(a) to adopt, by regulation, the terms and conditions of insurability, which includes the SFIP codified at 44 C.F.R. Pt. 61, App. A. Under §4081(a), which permits FEMA to enter into arrangements with private insurance companies in order to make use of their "facilities and services," FEMA established the WYO program to allow insurers like Defendant to sell and administer SFIPs. 44 C.F.R. § 62.23(a)-(d). The arrangement entered into with a private company provides that the WYO company "shall comply with written standards, procedures, and guidance issued by FEMA or FIA relating to the NFIP and applicable to the Company." 44 C.F.R. Pt. 62, App. A, Art. II(G)(1).

---

[1] Plaintiff also brought claims for vexatious refusal to pay and negligent misrepresentation, but these claims have been dismissed.

The SFIP is "more than a contract: it is also a regulation of [FEMA], stating the conditions under which federal flood-insurance funds may be disbursed to eligible policy holders," and "courts must strictly construe the statutory or regulatory limits upon disbursements of funds" through the federal flood insurance program. *Mancini v. Redland Ins. Co*., 248 F.3d 729, 733 (8th Cir. 2001). Payments made pursuant to an SFIP are paid out of the federal treasury. *Id*. "Unlike the usual insurance case in which federal courts apply the substantive state law governing the insurance contract, NFIP disputes are governed exclusively by substantive federal law," such that decisions from other federal courts should be considered in the interest of uniformity. *McCarty v. S. Farm Bureau Cas. Ins. Co.*, 758 F.3d 969, 972 (8th Cir. 2014).

Courts defer to a federal agency's interpretation of its own regulations "unless that interpretation is plainly erroneous or inconsistent with the regulation." *Decker v. Nw. Envtl. Def. Ctr*., 133 S. Ct. 1326, 1337 (2013) (citation omitted). The agency's interpretation "need not be the only possible reading of a regulation - or even the best one - to prevail." *Id*. The Court does not believe that FEMA's interpretation of what triggers the flood-in-progress exception in an SFIP, as set forth in FEMA's May 17, 2011 Memorandum, is plainly erroneous, and the Court will therefore defer to that interpretation. Thus, the flood in progress exclusion is triggered by the earlier of the following situations:

> A. The community where the insured building is located first experiences a flood as defined in the SFIP [i.e., as relevant here, a general and temporary condition of partial or complete inundation of two or more acres of normally dry land area] or

9

B. The date and time of an event initiating a flood that causes damage, including but not limited to:

    i) a spillway is opened,
    ii) a levee is breached,
    iii) water is released from a dam, or
    iv) water escapes from the banks of a waterway (stream, river, creek, etc.)

The Court concludes that the word "community" in the May 17, 2011 FEMA Memorandum is used as that word is defined in FEMA's definitional regulation related to the NFIP: "Community means any State or area or political subdivision thereof . . . which has authority to adopt and enforce flood plain management regulations for the areas within its jurisdiction." 44 CFR § 59.1. Based on this definition, the Court rejects Plaintiff's suggestion that in this case "community" should be taken to mean East Prairie, and agrees with Defendant that it means Mississippi County.

However, FEMA's determination that Mississippi County began experiencing flooding on April 22, 2011, does not answer the question before the Court, namely whether the flood that began on April 22, 2011 was the flood that caused damage to Plaintiff's insured property. FEMA's decision that it was, as stated in its denial of Plaintiff's appeal, is not an interpretation of an agency regulation, but rather an application of FEMA's regulations to the particular facts of one case. This decision does not get the same deference. *See United States v. Haggar Apparel Co.*, 526 U.S. 380, 391 (1999) ("Deference can be given to [agency] regulations without impairing the authority of the court to make factual determinations, and to apply those determinations to the law, *de novo*"); *Alliance for Cmty. Media v. F.C.C.*, 529 F.3d 763, 775 (6th Cir. 2008)

10

("Although the courts may have to grant deference to [agency orders], this does not in any way impede the courts' fact-finding or legal analysis during actual judicial proceedings").

The Court concludes that a second flood which began on May 2, 2011, at 10:00 p.m., with the breach of the levee, was the flood that damaged Plaintiff's property. The concept of a second flood was contemplated by FEMA, as reflected in FEMA's June 11, 2011 Memorandum, which states: "Even with a flood in progress, an intervening event that had not started at the time the policy became effective could cause a separate and independent flood event for which coverage could be afforded." The Morganza spillway example in this Memorandum supports the Court's conclusion. It was the opening of the spillway that started a flood, not flood conditions that led to the opening.

The Court finds unpersuasive Defendant's arguments that Defendant should prevail because there was no need to breach the levee but for the fact that the Mississippi River was already at flood stage and it was the very waters from the flood-stage Mississippi River that flooded and damaged Plaintiff's property. According to Defendant, it makes no difference whether the waters that damaged Plaintiff's property reached the property naturally or, as was the case here, as a result of an artificial breach of the levee. The salient fact remains, however, that the water that flooded Plaintiff's property would not have reached, much less damaged the property, but for the breach of the levee. The damaging flood was thus not in progress until the affirmative action of breaching the levee.

The Flood Adjuster's conclusion appears to the Court to be better supported by the facts and better reasoned than Defendant's denial decision as affirmed by FEMA. At least one other court has suggested that the artificial breach of the Birds Point levee created a flood on May 2, 2011, separate from the general flooding in the community that began on April 22, 2011. *See Big Oak Farms, Inc. v. United States*, 105 Fed. Cl. 48, 57 (Fed. Cl. 2012) (referring to the breach of the Birds Point levee as resulting in "the May 2, 2011 flood").

The Court also concludes that Defendant is not entitled to judgment pursuant to the common law doctrine of loss in progress, to the extent that this doctrine applies in NFIP cases. The doctrine precludes recovery when the insured is "aware of a threat of loss so immediate that it might fairly be said that the loss was in progress and that the insured knew it at the time the policy was issued or applied for." *Am. & Foreign Ins. Co. v. Sequatchie Concrete Servs., Inc.*, 441 F.3d 341, 343 (6th Cir. 2006) (citation omitted). At the time Plaintiff applied for the insurance at issue here, no decision had been made as to whether the levee would be breached.

A separate Judgment shall accompany this Memorandum and Order.

                                                     _Audrey G. Fleissig_
                                                   AUDREY G. FLEISSIG
                                                   UNITED STATES DISTRICT JUDGE

Dated this 25th day of February, 2015.